

## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF MICHIGAN

DEBRA J. TRAVIS, Individually,
and as Personal Representative of the
Estate of MARK P. TRAVIS, Deceased,

   Plaintiff,

vs.              Case No.
               Hon.

PETER LEVANOVICH, M.D.;
McLAREN NORTHERN MICHIGAN d/b/a
NORTHERN MICHIGAN REGIONAL
HOSPITAL; MICHIGAN HEART & VASCULAR
SPECIALISTS, a Department of McLAREN
NORTHERN MICHIGAN, and THE CARDIAC
INSTITUTE d/b/a MICHIGAN HEART &
VASCULAR SPECIALISTS,

   Defendants

_____/

RONALD K. WEINER (P40706)
STEFFANI CHOCRON (P45335)
MARC LIPTON (P43877)
LIPTON LAW CENTER, P.C.
Attorney for Plaintiff
18930 W. Ten Mile Road
Southfield, MI  48075
(248) 557-1688
marc@liptonlaw.com

_____/

## COMPLAINT AND JURY DEMAND

   NOW COMES Plaintiff, by and through counsel, and for her complaint against these

Defendants, states as follows:

## PARTIES AND JURISDICTION

   1.  Plaintiff Debra J. Travis is the duly appointed representative of the Estate of Mark P.

Travis, Deceased, and at all relevant times, a resident of Collier County in the State of Florida.

   2.  At all times relevant hereto, Mark P. Travis, Deceased, was a resident of Collier

County in the State of Florida.

18930 W Ten Mile Rd
Suite 3000
Southfield, MI  48075

Phone: 248.557.1688
Fax: 248.557.6344

www.liptonlaw.com

3.      Defendant Peter Levanovich, M.D. is a resident of the State of Michigan, who at all times relevant to this Complaint was doing business in the City of Petoskey, Emmet County, Michigan.

4.      The Defendant Northern Michigan Regional Hospital, an assumed name for McLaren Northern Michigan (hereinafter referred to as McLaren Northern Michigan) was at all relevant times, a Michigan Corporation doing business in the City of Petoskey, Emmet County, Michigan.

5.      The Defendant Michigan Heart & Vascular Specialists, a department of McLaren Northern Michigan, and an assumed name for The Cardiac Institute (hereinafter referred to as Michigan Heart & Vascular Specialists), was at all relevant times, a Michigan Corporation doing business in the City of Petoskey, Emmet County, Michigan.

6.      The subject matter jurisdiction of this Court is based upon diversity of citizenship pursuant to 28 U.S. § 1332.

7.      A substantial part of the events or omissions giving rise to the plaintiffs' claims happened in the Western District of Michigan and the above named Defendants transact business and are subject to personal jurisdiction in this district. Accordingly, venue is proper in this district pursuant to 28 U.S.C. § 1391.

8.      The amount in controversy is substantially in excess of seventy-five thousand dollars ($75,000), exclusive of interest and costs.

## GENERAL ALLEGATIONS

9.      Peter Levanovich, M.D. is an employee of Defendant McLaren Northern Michigan, acting during the course of and within the scope of his employment in connection with the acts or omissions described herein.

10.      McLaren Northern Michigan is liable for all errors, acts and omissions of Peter Levanovich, M.D. and any other employees and/or agents, whether real, implied or ostensible,

2

acting during the course of and within the scope of their employment and/or agency with McLaren Northern Michigan arising out of the events described herein.

11.    Peter Levanovich, M.D., is an employee of Defendant, Michigan Heart & Vascular Specialists, acting during the course of and within the scope of his employment in connection with the acts or omissions described herein.

12.    Michigan Heart & Vascular Specialists is liable for all errors, acts and omissions of Peter Levanovich, M.D., and any other employees and/or agents, whether real, implied or ostensible, acting during the course of and within the scope of their employment and/or agency with Michigan Heart & Vascular Specialists arising out of the events described herein.

### FACTUAL ALLEGATIONS

13.    At the time of his death, Plaintiff's decedent, Mark J. Travis, was a 58 year old married man with two adult sons. His health history included a cardiac catheterization with percutaneous transluminal coronary angioplasty (PTCA) in 1997 and PTCA with Rotoblade and stent placement x2 in 1998. An echocardiogram done on May 28, 2008 and a carotid ultrasound performed on June 4, 2008, showed no carotid disease, mild aortic stenosis and mild mitral valve regurgitation.

14.    On August 18, 2011, Plaintiff's decedent presented to McLaren Northern Michigan where he was seen by Dr. Duane Schuil of the cardiology department, with complaints of chest discomfort that had been occurring more frequently over the past few months. He complained of severe post-prandial angina and class IV angina at rest.

15.    An echocardiogram performed by or at the request of Dr. Schuil, at 9:30 am on August 18, 2011 was abnormal. It showed sinus bradycardia, an inferior infarct (age undetermined) and minimal ST segment depression. Dr. Schuil directed the admission of Mr. Travis to McLaren Northern Michigan for urgent cardiac catheterization.

16.     On August 18, 2011, a left heart catheterization with coronary angiography was performed, and Plaintiff's decedent was found to have significant triple vessel coronary artery disease with aortic valve stenosis. He was also evaluated in the catheterization lab by John D. Talbott, D.O., a Cardiovascular Surgeon who also recommended a valve replacement.

17.     On August 19, 2011, Plaintiff's decedent was taken to the Operating Room, where Dr. Talbott performed a median sternotomy with coronary bypass grafting x2 as well as aortic valve replacement utilizing a mechanical valve.

18.     Plaintiff's decedent was discharged on August 26, 2011.

19.     On August 31, 2011, at approximately 0945, Plaintiff's decedent presented to the Emergency Room of McLaren Northern Michigan at the recommendation of Dr. Talbott, with complaints of a "pounding, racing" heart, progressive dyspnea, lightheadedness and fatigue. He did not complain of chest pain.

20.     Physical examination of Plaintiff's decedent, by Dr. Andrew Kolp, an emergency medicine physician, showed a pulse of 110 (tachycardia), with a blood pressure of 126/80, respiratory rate of 18, a normal temperature and 1+ lower extremity edema.

21.     An electrocardiogram was done, which Dr. Kolb described as showing sinus tachycardia without ectopy. There was no evidence of new or ongoing infarct.

22.     An echocardiogram was also completed, and it showed a very large pericardial effusion with right ventricular diastolic collapse.

23.     Plaintiff's decedent was diagnosed with a post-operative tamponade, and was transferred to the catheterization lab at approximately 1100 for urgent pericardiocentesis.

24.     At 1125, Plaintiff's decedent was brought into the procedure room. At that time, his blood pressure was 124/87, pulse 113, respiratory rate 24, and his pain was 8/10.

25.     At 1133 the procedure began, with Dr. Levanovich choosing to use an anteroposterior

approach.

26.     During the course of his attempted pericardiocentesis, Dr. Levanovich withdrew approximately 900 ml of blood from Plaintiff's decedent's heart.

27.     At 1152, as a consequence of this inappropriate withdrawal of blood from the heart, Plaintiff's decedent became significantly hypotensive, with his blood pressure dropping to 92/65. His pulse remained tachycardiac at 112.

28.     Because of Levanovich's decision to use an anteroposterior approach, he was having difficulty accessing the Plaintiff's decedent's effusion, the decedent's tamponade was not resolving, and a significant degree of pericardial clear space remained; in response, Dr. Levanovich contacted thoracic surgery for help.

29.     At 1237 John D. Talbott, D.O. scrubbed in.

30.     Dr. Talbott confirmed that Dr. Levanovich had failed to place the catheter in the pericardial sac.

31.     By 1243, Plaintiff's decedent's oxygen saturations had decreased to 79%.

32.     At 1250 Dr. Talbott made a subxyphoid incision and a hole in the pericardial sac; he successfully and immediately removed bloody fluid from the pericardial sac.

33.     At 1252, Plaintiff's decedent was being bagged to keep his oxygen saturations above 90%.

34.     The procedure was completed at 1305, and Plaintiff's decedent was returned to the intensive care unit at 1325 with a cardiac monitor and oxygen in place. According to Dr. Talbott, he was in critical but satisfactory condition.

35.     At 1345, the nursing assessment indicates shortness of breath with exertion. Pulse was +2, heart rate tachycardic at 114, and his blood pressure was 131/80

36.     At 1351, Plaintiff's decedent complained of pain 9/10.

5

37.     At 1410, a chest x-ray was performed and showed no findings for new acute interval cardiopulmonary disease post pericardiocentesis.

38.     According to a consultation reported dictated by Giselle Nicholas, RN, for Dr. Talbott, at 1454, Plaintiff's decedent was seen in the ICU while receiving blood transfusions; he was short of breath with distended neck veins. EKG showed sinus tachycardia. She further reports that there was "concern for the fact that there was a potential that the catheter had slipped into the heart chamber" during the pericardiocentesis.

39.     A nursing entry made by Joann Looz, RN, at 1600 stated that Plaintiff's decedent was extremely tachycardic, with a heart rate of 180. He continued to complain of chest pain.

40.     At 1815 Nurse Looz noted that Plaintiff's decedent's blood pressure was 93/74, his pulse continued to be tachycardic at 116 beats per minute, pulses 2+, normal cap refill less than 2 seconds, respirations unlabored.

41.     At 0227, on September 2, 2011, Wendy Szymoniak, RN, noted diminished breaths sounds, and a new finding of a mechanical click when she evaluated heart sounds. She also reported normal sinus rhythm and sinus tachycardia.

42.     At 0510, a chest x-ray reported postoperative changes with cardiomegaly and atelectasis of the left lung base

43.     At 1000, Nurse Szymoniak, noted that Mark's heart rate was 121. He was also noted to be hypotensive with blood pressure of 98/75. His oxygen saturations were 96% on room air. He had diminished breath sounds.

44.     A CT Scan of the thorax at 1035 showed no pericardial fluid with an anterior pericardial drain in place, and layering bilateral pleural effusions greater left with left accompanying left basiliar subsegmental atelectasis.

45.     At 1155 Nurse Szymoniak charted that Plaintiff's decedent was anxious and

6

depressed. He continued to have diminished breath sounds and his cardiac rhythm continued to be charted as "sinus tachycardia". His heart rate was noted to be 116 at 1200.

46.     An Echocardiogram done at 1230 reported the following findings: Left ventricle: normal size wall thickness systolic function with no obvious regional wall motion abnormalities; Right ventricle: left atrium not well visualized; Mitral valve: structurally/functionally normal; Prosthetic aortic valve: not well visualized; Pericardium: no pericardial effusion, left pleural effusion.

47.     At 1315, Dr. Levanovich ordered that Plaintiff's decedent be transferred from the ICU to the CCU.

48.     At 1328 Kevin Kruger, RN, charted Mark's vitals and noted that his oxygen saturations were only 93% on room air.

49.     At 1406, nursing staff charted that Plaintiff's decedent was "fearful, restless".

50.     A pain management consultation with Joseph Sullivan, M.D., reported that Mark complained of a constant aching sensation in the central chest area and anxiety secondary to his pain. He had received 22 mg of IV morphine in the past 24 hours for "moderate to severe pain".

51.     At 1753, Jacqueline Pavlich, RN, noted that Mark's blood pressure had risen to 124/94. His oxygen saturations were 95% on 2 liter nasal cannula. Cardiovascular exam showed edema generalized, mechanical click, ventricular rate "97 bpm".

52.     At 1850, Mark was given Ativan for anxiety.

53.     A "Significant Event Record" written at 1900 states 15 CC out of drain, lots of pain, 4 mg of morphine every three hours, CT of chest in a.m., needs a psychological consult.

54.     At 1928, the ECG strip showed a heart rate of 70, followed by a drop to 23, causing the alarm for ECG low limit of 65 to go off.

55.     At 1930 James R. Guess, RN, claims to have seen Plaintiff's decedent "sitting at

bedside complaining of SOB and "a little" dizzy. Cool to touch. Assessed BS monitor alarm noted bradycardic - HR 22 on monitor. Laid bed flat. Called code."

56.     According to the Code Blue Record, Brian Gelb, M.D., arrived at 1929 to find CPR in progress with bag valve mask ventilation. Plaintiff's decedent had already received some initial ACLS medications, and continued to be pulseless. According to Dr. Gelb's Code Blue Summary, Plaintiff's decedent had had periods of PEA and asytole.

57.     Dr. Gelb successfully intubated Plaintiff's decedent on his first attempt. Bedside ultrasound showed little to no cardiac activity and the medical team was unable to assess a subxiphoid view to try to identify fluid or tamponade. Dr. Gelb attempted a "last ditch" pericardiocentesis and aspirated 10 mL of venous blood, with no notable improvement. Resuscitation effort continued until Mark was pronounced dead at 1950 on September 2, 2011.

58.     An autopsy was performed, which revealed no pericardial effusion; instead, the autopsy revealed that the posterior papillary muscle and the subendocardial region in the posterior wall showed pale tan mottling suspicious for acute myocardial infarction.

59.     This new area of ischemia near the papillary muscle occurred as a result of the iatrogenic injury caused by Dr. Levanovich to Mark P. Travis' heart during his failed attempt at pericardiocentesis on September 1, 2011. The injury caused cellular and muscle damage and death, resulting in ischemia and/or bradycardia and/or a disruption of the conduction system, which led to asystole, cardiac arrest and death.

60.     Debbie Travis, Mark P. Travis' wife, was present in the post-operative period and saw her husband suffering from symptoms caused by the medical providers identified here. She was present when he became bradycardic, and went into asystole. She suffered severe shock as the traumatic events surrounding her husband's death unfolded in front of her. The injuries and death that Mark Travis suffered were serious and of a nature that severe mental disturbance to his spouse

could reasonably be foreseen to follow, and the shock negligently inflicted upon her has resulted in actual physical harm to her.

## **NEGLIGENCE OF DEFENDANTS**

61.     Peter Levanovich, M.D. and McLaren Northern Michigan, Michigan Heart & Vascular Specialists and The Cardiac Institute, the entities that employed Peter Levanovich, M.D., breached the applicable standard of care by failing to:

a.   Exercise that degree of reasonable medical judgment and provide appropriate medical care that reasonable cardiologists would under same or similar circumstances;

b.   Be familiar with and comply with national and hospital guidelines, pathways and protocols, and peer reviewed research that are applicable to patients presenting with acute pericardial effusion;

c.   Exercise reasonable skill and diligence in performing an emergency pericardiocentesis, and further to do so in accordance with nationally accepted standards of care, national and hospital guidelines, pathways, protocols and peer reviewed research;

d.   Utilize ultrasound guidance and other equipment when performing pericardiocentesis to reduce the risk of iatrogenic injury to the heart, coronary vessels and arteries

e.   Understand and be sufficiently skilled in the technique of pericardiocentesis, and specifically, be sufficiently familiar and skilled with the technique required to avoid injury to  Mark P. Travis' heart, coronary vessels and/or arteries;

f.   Refrain from performing a pericardiocentesis using an "anteroposterior" approach, rather than a subxiphoid approach, so as to reduce or eliminate the risk of iatrogenic injury to a patient such as Mark P. Travis;

g.   Perform a pericardiocentesis in a safe and proper manner so as to avoid injury to surrounding organs, tissues and/or structures, including, but not limited to, causing an injury to Mark P. Travis' heart, coronary vessels and/or arteries;

h.   Timely and accurately complete medical records regarding surgical procedures, especially when said procedures resulted in known iatrogenic injury to Mark P. Travis, and refrain from subsequently altering or concealing iatrogenic events from the medical records, the patient and his family;

i.   Consider, suspect and include myocardial damage within the differential diagnosis after causing an iatrogenic injury to the myocardium and/or coronary

vessels during pericardiocentesis;

j.   Provide the nursing staff and other consulting physicians an accurate and complete medical history of Mark P. Travis', including that an iatrogenic injury occurred during the pericardiocentesis, so as to ensure that an appropriate differential diagnosis was considered during the post-operative time, and to further ensure that appropriate testing and treatment was initiated and maintained;

k.   Order appropriate tests, such as serial 12 lead EKGs, serial echocardiograms and serial cardiac enzymes, or appropriate radiographic examinations, in addition to ongoing cardiac monitoring, to timely and more specifically identify the presence of acute, ongoing or recurrent myocardial ischemia or infarct, and to compare those test results to all relevant prior tests;

l.   Timely and properly treat a patient with signs and symptoms of impending myocardial infarction, including but not limited to chest pain, tachycardia, dyspnea and anxiety, by administering appropriate and timely medications including aspirin, beta blockers, nitroglycerin and heparin, supplemental oxygen, or other treatment modalities, especially where the patient has suffered iatrogenic injury by a physician during pericardiocentesis and myocardial damage is apparent or suspected, before and after the patient sustains a re-occurrence of ischemia or conduction interruption or failure;

m.   Order appropriate monitoring, including timely vital sign checks by the nursing staff so as to immediately identify and rectify any rhythm disturbances caused by iatrogenic damage, whether they are due to ischemia or conduction system damage;

n.   Ensure that all appropriate orders were complied with in a timely fashion

o.   Any and all acts of negligence as identified through additional discovery.

62.   McLaren Northern Michigan d/b/a Northern Michigan Regional Hospital, Michigan Heart & Vascular Specialists, a Department of McClaren Northern Michigan and Michigan Heart & Vascular Specialists, an assumed name for The Cardiac Institut**e,** vicariously and individually, together with their agents, actual and/or ostensible, servants and/or employees including, but not limited to**,** Peter Levanovich, M.D., and Andrew Teklinski, M.D., breached the applicable standard of care by failing to:

a.   Select, train and monitor its employees, servants, agents, actual or ostensible, or its staff of physicians, to ensure that they were competent to perform optimum medical and/or surgical care and comply with the standard of care as described herein;

10

b.  Provide qualified medical staff with the proper training and ability to meet Mark Travis' needs, including the ability to properly perform a pericardiocentesis in accordance with the standard of care described herein;

c.  Ensure that appropriate policies and procedures were adopted and followed including, but not limited to, the safe and proper performance of surgical procedures such as emergency pericardiocentesis;

d.  Provide appropriate and adequate facilities and equipment, including but not limited to fluoroscopy, electrocardiography and other devices so as to reduce and/or eliminate the risk of iatrogenic injury to the heart, coronary vessels and arteries;

e.  Any and all acts of negligence as identified through additional discovery.

63.    As the direct and proximate result of the above identified violations of the applicable standards of practice or care, by the medical providers named herein, Dr. Levanovich alone or in concert with the other Defendants and their employees, caused and/or failed to prevent an iatrogenic injury to Mark P. Travis' heart in the area of the posterior papillary muscle and the subendocardial region in the posterior wall, and consequent pain, anxiety, tachycardia and dyspnea in the post-operative period.

64.    As a further consequence of the negligence and breaches of the standards of care by the defendants named herein, Mark P. Travis became immediately vulnerable to a follow-up episode of bradycardia, arrhythmia and/or conduction; Defendants subsequent failure to suspect or report the iatrogenic injury allowed the subsequent treating physicians and hospital nursing staff to imprudently assume that Plaintiff's decedent's complaints of chest pain and anxiety, and his symptoms of dyspnea and tachycardia, had a benign rather than a potentially deadly cause. Thus, the direct and proximate consequence of the defendants' negligence, poor choices and medical mistakes, the failure to report the iatrogenic injury to the staff, the subsequent failure to monitor and treat the patient and the failure to recognize the subsequent myocardial injury, was to leave Mr. Travis unprotected and vulnerable to an arrhythmia, which ultimately manifested itself in a lethal

11

course of bradycardia, arrhythmia and/or a disruption of the conduction system, causing asystole, cardiac arrest and death.

65.    Had the pericardiocentesis been properly performed, with appropriate choices and without medical mistakes that were violations of the applicable standard of care, and had Dr. Levanovich recognized, reported and treated the injury, or had the hospital staff and consultants been told of the injury so as to allow them to monitor and treat Mark Travis in the post operative phase, Mark P. Travis would not have been injured in the first place, would have received the proper monitoring and follow-up care after the injury had occurred, and his death would not have occurred.

66.    As a further direct and proximate result of the above mentioned acts and/or omissions by the Defendants, Plaintiff claims all damages recoverable under Michigan's Wrongful Death Act, including but not limited to:

   a.   Medical, hospital, funeral and burial expenses incurred;

   b.   Conscious pain and suffering by Mark P. Travis between the onset of his condition to his eventual death;

   c.   Losses suffered by decedent's next of kin as a result of his death, including loss of financial support, loss of service, loss of gifts or other valuable gratuities, loss of society and companionship;

   d.   Other elements of damage as shall be revealed in discovery.

67.    Concurrently with this complaint Plaintiffs have filed an Affidavit of Merit from Dr. Dan Fintel, MD, setting forth that Defendants breached the applicable standards of care, proximately causing the wrongful death of Mark Travis.

**NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS**

68.    Plaintiff re-alleges and re-incorporates all prior allegations as if fully set forth herein.

69.    At all relevant times all Defendants owed duties of reasonable care to Debra Travis, Mark P. Travis' wife, while she was in the presence of Plaintiff and able to witness distress caused

12

by their negligent acts as previously described.

70. Debra Travis, Mark P. Travis' wife, was present in the post-operative period and witnessed her husband suffering from symptoms caused by the negligence of the medical providers identified herein. She was present when he became bradycardic, and went into asystole and died.

71. Defendants' violations of the applicable standards of care set forth above also constitute violations of their duties of reasonable care owed to Debra Travis, as a family member bystander/witness to the suffering and death of her husband Mark Travis, caused by their negligent errors, acts and omissions.

72. Further, and independently of the obligations owed to Debra Travis as a family member of Mark Travis present during his injury and distress, Defendants owed duties of reasonable care to accurately, timely and completely report to her Mark Travis' medical condition, the treatment they provided in response, and any injuries that occurred as a result of their attempted treatment.

73. Defendants breached their duties to exercise reasonable care in the accurate, timely and complete disclosure to Plaintiff Debra Travis, the treatment they provided to Mark Travis, and the injuries that occurred during that treatment.

74. As a direct and proximate result of witnessing the traumatic events leading up to her husband's death, Debra J. Travis suffered and has continued to suffer from severe emotional distress, which has resulted in actual physical harm to her, and she continues to suffer from the physical manifestations and symptoms of severe emotional distress negligently inflicted upon her, including but not limited to shock, anguish, fright, horror, nervousness, grief, anxiety, worry, humiliation and shame.

75. As a direct and proximate result of Defendants failure to accurately, timely and completely report to Debra Travis the events that occurred during their treatment of her husband,

Debra J. Travis suffered and has continued to suffer from severe emotional distress, which has resulted in actual physical harm to her, and she continues to suffer from the physical manifestations and symptoms of severe emotional distress negligently inflicted upon her, including but not limited to shock, anguish, fright, horror, nervousness, grief, anxiety, worry, humiliation and shame.

### INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

76.    Plaintiffs re-allege and re-incorporate all prior allegations as if fully set forth herein.

77.    During his attempted pericardiocentesis of Mark Travis, it became apparent to Dr. Levanovich that he had withdrawn 900 ml of blood from Mr. Travis' heart, rather than fluid from the pericardial sac.

78.    Despite his actual knowledge of his failed pericardiocentesis, Dr. Levanovich concealed his medical error from Debra Travis, never reporting to her in summary or in detail what he did to her husband while attempting the pericardiocentesis.

79.    Dr. Levanovich's failure to disclose the actual events during his treatment of Plaintiff's decedent was done intentionally and/or with a reckless disregard for the rights of Debra Travis to receive complete, accurate and timely information about her husband's treatment and illness.

80.    The conduct of Dr. Levanovich in concealing the adverse event caused by his medical error from Debra Travis, and in completing a medical record by including material discrepancies from the actual events, is so extreme and outrageous that it is completely intolerable and beyond the bounds of acceptable medical practice in a normal civilized society.

81.    Defendants knew or should have known that Debra J. Travis, as the spouse of Plaintiff's decedent, was susceptible to additional emotional injury as a result of the misconduct of Dr. Levanovich described herein, had the wherewithal to avoid or remedy the misconduct, yet consciously failed and refused to do so.

82.     As a direct and proximate result of decisions and conduct of the Defendants, Debra J. Travis suffered and has continued to suffer from extreme emotional distress, which has resulted in actual physical harm to her, and she continues to suffer from the physical manifestations and symptoms of severe emotional distress recklessly and intentionally inflicted upon her, including but not limited to shock, anguish, fright, horror, nervousness, grief, anxiety, worry, humiliation and shame.

WHEREFORE, Plaintiff, Debra J. Travis, Individually, and as Personal Representative of the Estate of Mark P. Travis, Deceased, requests entry of judgment against these Defendants, jointly and severally for all damages to which she is entitled to by virtue of their actions, together with costs, interest and attorney fees so wrongfully sustained.

<strong>LIPTON LAW, P.C.</strong>

__/S/ Marc Lipton_____
Marc Lipton P43877
Attorneys for Plaintiff
18930 W. Ten Mile Road, Ste. 3000
Southfield, MI 48075
(248) 557-1688

Dated:  January 23, 2014

<strong>JURY DEMAND</strong>

Plaintiff, Debra J. Travis, Individually and as Personal Representative of the Estate of Mark P. Travis, Deceased, hereby demands trial by jury in the above matter.

<strong>LIPTON LAW, P.C.</strong>

__/S/ Marc Lipton_____
Marc Lipton P43877
Attorneys for Plaintiff
18930 W. Ten Mile Road, Ste. 3000
Southfield, MI 48075
(248) 557-1688

Dated:  January 23, 2014